John V. RIMARCIK, Plaintiff,

v.

J. Richard JOHANSEN, as City Clerk of Minneapolis; Joseph L. Donovan, as Secretary of State of the State of Minnesota; Ben Allison, as Register of Deeds of Hennepin County, Defendants,

and

George C. Dodds, Intervenor.

No. 4–69 Civil 216.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 4, 1970.

Norman L. Newhall, Jr., Minneapolis, Minn., for plaintiff.

Bruce W. Okney, Sp. Asst. Atty. Gen., St. Paul, Minn., George V. Johnson, John K. Harvey, Asst. City Attys., Minneapolis, Minn., for defendants.

Clay R. Moore, Minneapolis, Minn., for intervenor.

Before HEANEY, Circuit' Judge, and LARSON and LORD, District Judges.

## MEMORANDUM DECISION

### MILES W. LORD, District Judge:

This case raises the issue of whether a provision in a state statute requiring a 55% favorable vote for adoption of an amendment to a home rule charter is unconstitutional as violative of the Equal Protection Clause. The statute in question is Chapter 1027, § 2, Laws of Minnesota 1969, which provides that any provisions in a home rule charter which prohibit the sale of intoxicating liquor or wine in certain areas shall not be amended or removed unless a proposition to that effect received 55% of the votes cast. For reasons which follow, we have concluded in the affirmative.

## I.

Home rule provisions under which a city may establish a charter for its own governing body were originally prescribed in Article 4, § 36, and added to the Minnesota constitution in 1896. This constitutional provision was repealed by L.1957, c. 809, adopted at a general election on November 4, 1958.[1] It was replaced by the present Article XI of the state constitution, § 4 of which provides in part:

> The legislature shall provide by law for charter commissions. * * * Home rule charter amendments may be proposed by a charter commission or by a petition of five percent of the voters of the local government unit as determined by law and shall not become effective until approved by the voters by the majority required by law. Amendments may be proposed and adopted in any other manner provided by law.

Pursuant to this grant of authority the state legislature, in the 1959 regular session, enacted L.1959, c. 305, § 4, which amended 24 M.S.A. § 410.12, subd. 4. As amended, subd. 4 read that a majority of 55% of the votes cast was necessary to carry any amendment to a city charter. The law made no distinction with respect to whether or not the amendment affected established liquor patrol limits—that is, any amendment to a city charter required 55% voter approval for adoption. This provision remained unchanged until 1969 when the legislature enacted Chapter 1027. Chap-

---

1. For an interpretation of the legislative history of this provision see Bard v. City of Minneapolis, 256 Minn. 581, 99 N.W.2d 468 (1959). In *Bard* the Minnesota Supreme Court interpreted § 4 as a grant of authority to the state legislature to fix the percentage of votes required to amend a city charter.

ter 1027, by its three sections, made the following changes:

1. Section 1: Amended 24 M.S.A. § 410.11 to provide that a new charter could be adopted if 51% of the votes cast on the proposition were in favor of the proposed charter.

2. Section 2: Added to 24 M.S.A. § 410.121 the provision that any amendment to the city charter which affected provisions prohibiting the sale of intoxicating liquor or wine in certain areas had to receive 55% of the votes cast to pass.

3. Section 3: Amended 24 M.S.A. § 410.12, subd. 4, to provide that an existing charter could be amended or replaced if 51% of the votes cast on the proposition were in favor of its adoption.

In substance, then, Chapter 1027 had the effect of requiring 51% voter approval for the adoption of a new city charter or the amendment of an existing charter with the exception that under § 2, if the amendment affected the established liquor patrol limits it needed 55% voter approval for adoption. It is the constitutionality of the 55% requirement which is in contention in this case.[2]

Plaintiff's constitutional claim originates from a proposition placed on the ballot for the general election held on June 10, 1969 in the City of Minneapolis. The proposition entitled Amendment 39, concerned an amendment to Chapter 4, Section 5, of the Charter of the City of Minneapolis relating to the granting of liquor licenses within a designated area. Section 5, subd. 1, establishes a geographical boundary, roughly equivalent to the area of the downtown loop, which comprises the so-called "liquor patrol limits". Under the City Charter, the Minneapolis City Council

has the authority to grant on-sale and off-sale liquor licenses within the patrol limits. Outside the patrol limits, licenses may be issued on either one of the following two conditions: (1) The City Council may renew a license of an established business; or (2) a new license may be issued upon majority approval in a referendum vote of the residents within the ward and within the precincts located within 1500 feet of the proposed location of the liquor establishment. The proposed Amendment 39, if adopted, would have removed the liquor patrol limits and replaced it with a procedure for the issuance of liquor licenses anywhere within the City of Minneapolis by the City Council in accordance with certain prescribed procedures.

Thus, Amendment 39 was placed on the ballot pursuant to the provisions of state law regarding adoption of home rule charters and amendments thereto enacted by the state legislature under a grant of authority in the Minnesota Constitution. Its purpose was to allow the voters in Minneapolis to determine whether the liquor patrol limits contained in the Minneapolis City Charter should be removed and replaced with a new procedure for the issuance of liquor licenses. Under Chapter 1027, § 2, it was necessary for the amendment to receive an affirmative vote of 55% of the votes cast in order to be adopted. The proposed amendment received 59,456 "Yes" votes compared to 53,272 "No" votes, or 52.7% of the votes cast were in favor of its adoption. This, of course, fell short of the 55% required under § 2.

Plaintiff, a taxpayer and voter in the City of Minneapolis, initiated this action, asserting federal jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1983, 1988 to redress the alleged deprivation of Federal constitutional rights. This action is brought by plaintiff on his own

---

2. Sec. 2 of Chapter 1027 reads:
"[410.121] Sale of intoxicating liquor or wine; favorable vote.
"If the charter which is to be amended or replaced contains provisions which prohibit the sale of intoxicating liquor

or wine in certain areas, such provisions shall not be amended or removed unless 55 percent of the votes cast on the proposition shall be in favor thereof."

behalf as a voter who voted "Yes" on Amendment 39, and on behalf of the other 59,455 voters who voted in favor of the amendment. His claim is that Chapter 1027, § 2, by requiring more than 50% plus 1 vote to pass amendments to city charters, violates his rights, and the rights of all others voting "Yes" on the amendment. He contends the provision "debases the value of a 'Yes' vote in relationship to the value of a 'No' vote, in direct contravention of the principle of 'one man, one vote' as enunciated by the United States Supreme Court in Baker v. Carr, [369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)], and following cases." He asserts that the application of a 55% requirement for passage says, in effect: "45 men voting 'No', equals 55 men voting 'Yes'."

The defendants are the Minneapolis City Clerk, the Minnesota Secretary of State, and the Hennepin County Register of Deeds. Under §§ 410.11 and 410.-12, subd. 4, 24 M.S.A., they are responsible for filing the necessary certificates that an amendment to a city charter was dully adopted at an election. By way of affirmative relief, plaintiff asks that the Court declare that Amendment 39 was duly adopted at the election of June 10, 1969, and order the City Clerk to file the necessary certificates to that effect in his office and the offices of the above State and County officials.

On request of the plaintiff, and based on the allegations in the complaint, this three judge court was convened pursuant to the provisions of § 2284, Title 28 U. S.C.A. by the Chief Judge of the Eighth Circuit on June 30, 1969. Thereafter, by order dated July 28, 1969, with the consent of all the parties hereto, the Court granted the application of George C. Dodds for intervention. On the same date, intervenor made a motion that this action was not required to be heard by a three judge court under § 2281, Title 28 U.S.C.A. A hearing was held and the motion was denied on the grounds that the plaintiff's claim raised a substantial constitutional question concerning a statute of statewide application, coupled with a request for equitable relief, and thus is within the purview of § 2281.

The defense in this case has been presented primarily by the intervenor, a taxpayer and voter in the City of Minneapolis, who voted "No" on the proposed. Amendment 39.[3] His position is that the issue presented in the plaintiff's complaint "is nonjusticiable and is essentially political and therefore beyond the proper exercise of the power of the federal court." If, however, the Court should reach the merits he asserts that the case must be decided in favor of the defendants.

## II.

Intervenor's threshold contention that plaintiff's claim is non-justiciable because it is essentially political may be disposed of without extensive comment. In Baker v. Carr, *supra*, the Supreme Court held that a claim asserted under the Equal Protection Clause, alleging impairment of a person's right to vote because of a dilution or debasement of its value in relation to other votes, presents a justiciable issue subject to adjudication by federal courts. Under Baker v. Carr, *supra*, it is clear that this court has jurisdiction, that plaintiff's complaint states a justiciable cause of action, and that plaintiff has standing to raise the constitutional issue.[4]

3. Defendants, both at the hearing held on September 15, 1969, and by subsequent letters, have indicated to the Court that they believe that intervenor Dodds has sufficiently presented their case and that they could add nothing.

4. Plaintiff brought this case under 28 U.S. C.A. § 1343(3), to redress the deprivation "under color of state law" of a

"right, privilege or immunity secured by the Constitution of the United States * * *." Plaintiff asserts a "plain, direct and adequate interest in maintaining the effectiveness of" his vote, Coleman v. Miller, 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385, 122 A.L.R. 695 (1939). We believe that his claim of a denial of equal protection of the laws presents a justiciable constitutional

### III.

We turn, then to plaintiff's claim that the 55% requirement is violative of the Equal Protection Clause because its effect is to substantially dilute and debase the weight of a "Yes" vote in relation to a "No" vote.

 Our initial concern is to determine the standard we must apply in evaluating the classification made by § 2. In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court said, "(S)ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Thus, when a state statute affects a citizen's fundamental right to vote, it is not afforded the deference usually given to the judgment of state legislatures. See, e.g., Kramer v. Union Free School District No. 15, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). The test is not whether there is a "rational basis" for the distinctions made, but rather whether the distinctions are necessary to promote a compelling state interest. Kramer v. Union Free School District No. 15, supra, 395 U.S. at 627–628, 89 S.Ct. 1886. This exacting standard applies not only to cases in which a state statute denies the franchise, e.g., Kramer, but also to cases in which a state statute dilutes or debases a vote. As stated by the Court in Reyn-

olds v. Sims, supra, 377 U.S. at 555, 84 S.Ct. at 1378, "(T)he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

In asserting that the 55% requirement in question is constitutional, intervenor argues: (1) That the one man, one vote cases are clearly distinguishable from the present case and provide no support to the plaintiff's claim; (2) that the classification made by the statute serves a legitimate state purpose; (3) that a state legislature must be given considerable discretion in structuring laws concerning city government, and that this discretion should include the right to require more than a bare majority vote to change the basic constitution of a city; and (4) that holding the 55% requirement unconstitutional would produce drastic results in that many additional state constitutional and statutory provisions requiring more than a majority vote would necessarily be invalidated by such a decision. We discuss the contentions in the order raised.

In a succession of cases following Baker v. Carr, supra, the Supreme Court articulated the principle of one man, one vote by requiring that each man's vote must have equal weight in the election of local, state and federal representatives.[5] Most notably, in Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) and Reynolds v. Sims, supra, the Court held that a person's vote could not be diluted or debased simply because of where the voter happened to reside within the state. Plaintiff contends that the policy under-

---

cause of action and that he has standing to assert this claim. As stated by the Supreme Court in Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960):

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right."

5. E. g., Lucas v. Forty-Fourth Gen. Assembly of Colo., 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed. 2d 609 (1964); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); WMCA, Inc. v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964).

lying these decisions applies to the present case. He argues that the weighting of votes by direct legislative fiat is as discriminatory as the weighting of votes by means of malapportioned districts or other forms of weighting based on geography.

In Gray v. Sanders, *supra*, the Supreme Court considered the question of whether the Georgia county-unit system, applicable in statewide primary elections, violated the Equal Protection Clause. In holding the county-unit system unconstitutional, the Court stated:

How then can one person be given twice or 10 times the voting power of another person in a statewide election merely because he lives in a rural area or because he lives in the smallest rural county? Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions. Gray v. Sanders, *supra*, 372 U.S. at 379–380, 83 S.Ct. at 807.

In Reynolds v. Sims, *supra*, the Supreme Court dealt with the malapportionment of the Alabama legislature. The Court held that the Equal Protection Clause of the Fourteenth Amendment requires the apportionment of both houses of a bicameral legislature on a population base to insure equal representation for citizens regardless of where they reside. In reaching this result, the Court focused on the obvious effect resulting from the weighting of votes:

(I)f a state should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five or 10 times for their legislative representatives, while voters living elsewhere could vote only once. And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable. * * * Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there. The resulting discrimination against those individual voters living in disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State. Two, five, or 10 of them must vote before the effect of their vote is equivalent to that of their favored neighbor. Weighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable.

\* \* \* \* \* \*

To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. * * * A citizen, a qualified voter, is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection

Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of "government of the people, by the people, [and] for the people." The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races. Reynolds v. Sims, *supra*, 377 U.S. at 562–563, 567–568, 84 S.Ct. at 1382–1385.

In Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), the Court applied the rationale of Reynolds v. Sims, *supra*, to local governmental bodies entrusted with legislative functions. The Midland County Commissioners Court was comprised of five members, four of whom were elected from the four districts into which the county was divided and one elected at large. Plaintiff claimed that the gross disparity in population distribution among the four districts rendered his vote of less value and violated the Equal Protection Clause. The Supreme Court agreed. It held that the "Constitution permits no substantial variation from equal population in drawing districts for units of local government having general governmental ·powers over the entire geographic area served by the body."

In these and related cases, then, the Supreme Court articulated the principle that the Equal Protection Clause requires "equal representation for equal numbers of people." Reynolds v. Sims, *supra* at 560–561, 84 S.Ct. 1362, 1380.

Intervenor contends that since these cases concerned discriminatory treatment in the election of legislators based on geographical location of the voter, they are clearly distinguishable from the case at bar. He asserts that the principle of one man, one vote was enunciated to remedy this particular evil attendant to malapportionment, and cannot be construed to include within its contours the circumstances of this case.

■■ We agree that the above cases are factually distinguishable with respect to the means by which the dilution was accomplished as well as the type of election in which it occurred. Neither of these factors, however, is dispositive of plaintiff's claim. The fact that this case differs in the means by which the dilution of the vote is accomplished is in no way determinative of whether or not the dilution is discriminatory. The right protected in the one man, one vote cases is a person's right to have his vote be given equal weight to that of other voters. Whether the state denies this right by malapportioned districts or by some other means is not the controlling factor in determining whether the state has acted constitutionally. We believe the test is not the means by which the state has exercised its power to deny a person within its jurisdiction the equal protection of the laws, but whether the power has in fact been exercised. Similarly, the fact that § 2 prescribes voter approval requirements in a limited purpose election does not insulate it from being reviewed by this Court to determine whether it is consistent with Constitutional requirements.[6]

■ We view the underlying policy of the one man, one vote cases as establishing a basic constitutional principle— equality among voters.[7] Insofar as that principle is concerned, the one man, one

6. Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). In *Kramer* the Court dealt with the constitutionality of a section of the New York Education Law which excluded certain citizens from voting in school district elections. In *Cipriano* the constitutional claim involved a Louisiana statute which denied the franchise to otherwise qualified voters in an election on the issuance of municipal bonds simply because they were not "property taxpayers." See also State ex rel. Witt v. State Canvassing Board, 78 N.Mex. 682, 437 P.2d 143 (1968).

7. As stated by Justice Douglas in his dissenting opinion in South v. Peters, 339 U.S. 276, 279, 70 S.Ct. 641, 94 L.Ed. 834 (1949), cited by the Court in Reynolds v. Sims, 377 U.S. 533, 555 n. 29, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506:

68

vote cases are not substantively distinguishable from the case at bar. Each case of course must be decided on its own merits. Plaintiff's claim presents us with two issues: First, whether § 2 does in fact discriminate against a class of voters; and second, if it does, is such discrimination violative of the Equal Protection Clause. We believe the one man, one vote cases do provide us with substantive guidelines under the concept of equal protection to be applied in the resolution of these issues.[8]

With respect to the first issue, we believe that § 2 does discriminate against a class of voters; namely, those who vote "Yes" on a proposed amendment. The efficacy of the "Yes" vote is effectively diminished by the 55% voter approval requirement. The basis for the discrimination is that the statute, in granting the franchise in the manner it does, ascribes a value to the vote according to the voter's preference on the issue to be decided in the election. It thereby grants those opposed to the amendment a disproportionate voice in the outcome of the election. The remaining issue we must determine, then, is whether the state in so granting the franchise has done it in such a manner as to violate the Equal Protection Clause.

█ The command of the Fourteenth Amendment is that "(n)o state * * *

"There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted. * * * It also includes the right to have the vote counted at full value without dilution or discount. * * * That federally protected right suffers substantial dilution * * * [where a] favored group has full voting strength. * * * [and] [t]he groups not in favor have their votes discounted."

8. The Court notes that to date several state courts have applied the principle of one man, one vote in cases involving substantially the same issues presented here. In Lance v. County of Roane et al., W.Va., 170 S.E.2d 783 (W. Va. Supreme Court, July 9, 1969), the West Virginia Supreme Court in-

shall deny to any person within its jurisdiction the equal protection of the laws." The "concept of equal protection has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged." Reynolds v. Sims, *supra*, 377 U.S. at 565, 84 S.Ct. at 1383. Uniform treatment does not mean that a state may never distinguish between citizens. Avery v. Midland County, *supra*, 390 U.S. at 484, 88 S.Ct. 1114. Carrington v. Rash, 380 U.S. 89, 92, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965). The Supreme Court has stated that the test is whether the statute, by distinguishing between citizens, constitutes an invidious discrimination against those disadvantaged by the classification. Avery v. Midland County, *supra* at 484, 88 S.Ct. 1114; Reynolds v. Sims, *supra* at 561, 84 S.Ct. 1362. This test is to be made on the basis of all relevant factors, including, when the statute affects a fundamental right, whether the classification is necessary to promote a compelling state interest. Kramer v. Union Free School District No. 15, *supra*.

Intervenor argues that there is a legitimate state interest underlying the requirement for a 55% voter approval for passage of an amendment which affects a city's liquor patrol limits. This argument is premised on two conten-

validated two West Virginia constitutional provisions which required 60% voter approval for the passage of a bond issue and an additional tax levy, respectively. In dismissing the argument that the one man, one vote principle was intended to cover only cases of malapportionment in the election of public officials, the court stated:

"(T)he 'one person, one vote' principle has been stated in general terms and without qualification under the Equal Protection Clause. The application of that general principle has not, to our knowledge, been denied in any other area of voting in public elections."

See also, Lorez v. Shannon, No. 16043 (Superior Court of California, Sutter County, August 8, 1969); and Bogert v. Kinzer, No. 27864 (District Court of the Sixth District of Idaho, Bannock County, April 3, 1969).

tions: First, that control of liquor traffic within the state is of legitimate state concern; and secondly, that the state has manifested this concern by requiring that, before local communities be allowed to change their provisions affecting liquor traffic, any such change reflect a true dominant community feeling.

This argument proves no more than the possibility that there may be a rational basis for the classifications drawn by § 2 in view of the articulated state goal. As we noted earlier, however, a more exacting standard applies here— that is, whether the dilution of the vote of the plaintiff and members of his class is "necessary to promote a compelling state interest". We do not believe so.

Section 2 is distinguishable from a statute in which the state directly exercises its power to control liquor traffic within the state. The statute does not in itself prescribe liquor patrol limits or other means of containing the sale of liquor.[9] Rather, the statute delegates that power to the voters in the local communities. In granting the franchise, however, the state discriminates against a class of voters. Nothing in the state constitution requires the legislature to grant to the people the right to decide this type of issue. The state legislature can directly enact legislation regarding liquor patrol limits.[10] Any legislation to that effect, of course, requires a simple majority vote[11] of the state legislators. Since the legislature is presumably properly apportioned, each person would therefore have an equally effective voice when the legislature directly enacts such a law. In contrast, when the legislature grants the franchise to the people to determine the issue in the manner prescribed by § 2, voters like the plaintiff no longer have an equally effective voice when they cast their ballots. The effect given their vote is diluted in relation to those who vote "No".[12]

In Gray v. Sanders, *supra*, 372 U.S. at 381, 83 S.Ct. at 809, the Supreme Court stated, "(O)nce the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded."[13] We believe this particularly

9. It is clearly within the power of the state legislature to enact laws controlling liquor traffic within the state. It may well have been a proper exercise of that power for the state to directly enact legislation prescribing where within the city boundaries liquor businesses may be established.

10. Article XI, § 4, of the Minnesota constitution, under which the legislature enacted the laws providing for public referendum on the amending of city charters, provides that "Amendments may be proposed and adopted in any other manner provided by law." This made it discretionary with the legislature whether to grant to the people the franchise on this matter or to devise procedures whereby the legislature itself could amend city charters.

Of course, the fact that the question scheduled for election need not have been submitted to the voters under this constitutional scheme is not a controlling factor in this case. Kramer v. Union Free School District No. 15, *supra*, 395 U.S. at 628–629, n. 11, 89 S.Ct. 1886. We believe the question is, as we previously stated, once the legislature decides to grant the franchise has it done so in a constitutionally permissible manner?

11. M.S.A.Const. art. 4, § 13.

12. In Kramer v. Union Free School District No. 15, *supra* at 627 n. 7, 89 S.Ct. at 1889, the Supreme Court analyzed a similar problem under the facts of that case. We believe that analysis is particularly relevant here. The Court stated, "(T)he effectiveness of any citizen's voice in governmental affairs can be determined only in relationship to the power of other citizens' votes." Under the facts of this case, when the legislature directly acts on the question of liquor control each citizen has an equally effective voice in the decision-making process. On the other hand, when the legislature delegates to the people the right to decide the issue under the 55% voter approval requirement, this equality is no longer present.

13. Compare Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966): "(O)nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protec-

true in this case where the decision to grant the franchise or not was exclusively within the control of the state legislature. When the issue can be decided by the state legislature under a procedure which gives equal voice to every citizen, we do not believe that this equality may be evaded by the simple means of delegating the decision-making process to the people on discriminatory lines. No showing has been made that this discrimination is "necessary to promote a compelling state interest." To hold otherwise would sanction the right of the state to impair the citizen's right to have an equally effective voice in the decision-making process whenever the state legislature decided to delegate to the people the right to determine a certain issue by an election.[14] See Baker v. Carr, *supra*, 369 U.S. at 230, 82 S.Ct. 691. If the state believes it has some interest in the outcome of an election held under the circumstances of this case, it may not attempt to preserve that interest by granting the franchise with one hand and diluting its efficacy with the other by requiring more than a majority vote to determine the outcome of the election. This amounts to no more than invidious discrimination.

Intervenor next contends that a greater than majority vote is necessary if a city charter is to have some permanency. He argues that a city charter represents a constitution of a city and that the state legislature, recognizing this, can properly require that such a fundamental document should not be subject to change on the whims of what may be a fleeting majority. The contention is that the Court must allow the state legislature considerable discretion in setting voter approval requirements with respect to adoption of amendments which change charter provisions.

Local governmental bodies are agencies of the state and they exercise only such governmental functions as the state may entrust to them. The scope of the powers they exercise is in the absolute discretion of the state. E.g., Minneapolis St. Ry. Co. v. City of Minneapolis, 229 Minn. 502, 40 N.W.2d 353 (1950), appeal dismissed, 339 U.S. 907, 70 S.Ct. 574, 94 L.Ed. 1335 (1950). Thus, for state law purposes, the adoption of a home rule charter or any amendment is no more than the exercise of legislative power and the charter has no more stature than any other state statute. E.g., State ex rel. Town of Lowell v. City of Crookston, 252 Minn. 526, 91 N.W.2d 81 (1958); Mitchell v. City of St. Paul, 228 Minn. 64, 36 N.W. 2d 132 (1949). For example, whatever the voters may do in an election such as that held here, the state legislature can subsequently enact general legislation completely nullifying its effect. Ramaley v. City of St. Paul, 226 Minn. 406, 33 N.W.2d 19 (1948). This being true, we fail to see how a city charter can be characterized as a fundamental document which should be afforded particular deference. The state legislature may enact or amend general laws modifying or withdrawing powers entrusted to the city by a simple majority vote. When the legislature grants to the people of the local communities the right to change their charter, we can see no reason why it should not also be done by a simple majority vote.

As a final argument, intervenor contends that holding the 55% requirement invalid would produce drastic results in that many additional state constitutional and statutory provisions requiring more than a majority vote would necessarily be invalidated. Our decision, however, goes no further than invalidating the

tion Clause of the Fourteenth Amendment."

14. See Avery v. Midland County, 390 U.S. 474, 480, 88 S.Ct. 1114, 1118, 20 L.Ed.2d 45 (1968), wherein the Supreme Court stated:

"(W)hen the State delegates lawmaking power to local government and pro-

vides for the election of public officials from districts specified by statute, ordinance, or local charter, it must insure that those qualified to vote have the right to an equally effective voice in the election process."

55% requirement as a constitutionally impermissible dilution of the vote under the circumstances of this case. Under none of the arguments made can we find a compelling state interest served by granting the franchise in the discriminatory manner prescribed by § 2. We do not pass on the question, therefore, of whether under a different state constitutional or statutory scheme there may exist a compelling state interest justifying a requirement for more than a majority vote.

The protections embodied in the Equal Protection Clause are not confined to any fixed notion of what constitutes equal treatment.[15] One of these protections, as expressed by the Supreme Court in the one man, one vote cases, is the right of a citizen to have an equally effective voice in the election process. This is, as we noted earlier, the basic policy underlying those decisions. Once it is determined that the dilution or debasement of a vote by a state statute is not justified by a compelling state interest, but rather constitutes invidious discrimination, we believe it contravenes that policy. Under these circumstances, we believe the principle of one man, one vote applies to redress the deprivation here of the plaintiff's constitutionally protected right.

IV.

■ Finally, the Court must decide upon the nature of the relief to be provided. The plaintiff asks that a mandatory injunction be issued requiring the proper officials to certify that Amendment 39 was adopted at the election of June 10, 1969. He cites Lorez v. Shannon, No. 16043 (Superior Court of California, Sutter County, August 8, 1969), and Bogert v. Kinzer, No. 27864 (District Court of the Sixth District of Idaho, Bannock County, April 3, 1969), as authority for our doing so.

The essence of equity jurisdiction is the power of the court to use flexibility in forming a decree which is suited to the exigencies of the particular case. We do not question our power to grant the plaintiff's request, but we find no compelling reasons for so doing.[16] The issue is not so burning, the time element so crucial, nor the cost so prohibitive that the voters should be deprived of an opportunity to vote on the issue again with the knowledge that the proposal will be adopted if it receives a simple majority vote.[17] *

15. In Harper v. Virginia Bd. of Elections, *supra*, 383 U.S. at 669, 86 S.Ct. at 1083, the Court stated: "In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality * * *. Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change." (emphasis original)

16. In Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967), the Court set aside a local election which had been completed, but only because of the gross and indefensible nature of the racially discriminatory practices used at the election. See also, Hamer v. Campbell, 358 F.2d 215 (5th Cir.), *cert. denied*, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966). But see, McGill v. Ryals, 253 F.Supp. 374 (D. Ala.), *appeal dismissed*, 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17 (1966); Smith v. Paris, 257 F.Supp. 901 (D.Ala.1966), *aff'd*, 386 F.2d 979 (5th Cir. 1967).

17. For a similar case declaring part of a statute unconstitutional but retaining the other procedures under the statute, see: Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (state statute requirement necessitating a one-year residency period before an AFDC mother is eligible for aid held unconstitutional while the other statutory procedure remained intact). See also, Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (January 19, 1970); Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

* The writer of this opinion differs with his colleagues only with regard to the form of relief granted herein. The writer would declare the statute invalid in its entirety and thus require the parties to await action by the state legislature in the light of the reasoning and holding in this opinion. He feels that in doing otherwise, this Court usurps legislative prerogatives.