REQUESTED BY: Senator C. N. "Bud" Robinson Nebraska State Legislature
You have requested an opinion from this office regarding the constitutionality of two proposals which are now being drafted in legislative form. The first proposal would require participation by an unspecified percentage of the registered voters in a particular school district for approval of the issuance of school bonds. The other proposal would eliminate the ability of school districts to call a special election for the purpose of voting on school bonds. As we have not been provided with a draft of any legislation which you are contemplating, our opinion as to the constitutionality of your proposals is necessarily limited to a review of issues arising from the general concepts as set forth above, rather than a review of specific legislation.See Op. Att'y Gen. No. 95-004 (January 18, 1995); Op. Att'y Gen. No. 82-214 (March 15, 1982).
Pertinent Statute Enactment History
The Nebraska Constitution mandates that "[a]ll elections shall be free; and there shall be no hindrance or impediment to the right of a qualified voter to exercise the elective franchise." Neb. Const. art. I, § 22. This provision is not a grant of power but rather a limitation of power; therefore, "the Legislature has vast authority [to legislate in the area of election matters, such power being] limited only by the state and federal Constitutions." State ex rel.Creighton University v. Smith, 217 Neb. 682, 687,353 N.W.2d 267, 271 (1984); see also Lenstrom v.Thone, 209 Neb. 783, 311 N.W.2d 884 (1981);Orleans Education Ass'n v. School Dist. ofOrleans, 193 Neb. 675, 692, 229 N.W.2d 172, 182 (1975) ("The state Legislatures have plenary legislative power except as is expressly denied them by the Constitutions or as is expressly reserved to the people themselves."); Evans v.Cornman, 398 U.S. 419 (1970) (U.S. Supreme Court noted its principle "that the states have long been held to have broad powers to determine the conditions under which the right to suffrage may be exercised"). Pursuant to its authority, the Legislature has vested Nebraska school districts with the power to issue bonds, for specified purposes, so long as the conditions of Neb. Rev. Stat. § 10-702 to § 10-716 are satisfied.See Neb. Rev. Stat. § 10-701 (1991).
The statute pertinent to your inquiry provides:
 The question of issuing school district bonds may be submitted at a special election or such question may be voted on at an election held in conjunction with the statewide primary or statewide general election. No bonds shall be issued until the question has been submitted to the qualified electors of the district and a majority of all the qualified electors voting on the question have voted in favor of issuing the same. . . .
Neb. Rev. Stat. § 10-702 (Cum. Supp. 1994). We review this statute's enactment history in order to provide a framework for response to your inquiry.
In 1879, legislation was originally[1] enacted to vest school districts with the power to issue bonds for limited purposes. 1879 Neb. Laws § 1, p. 170. A two-thirds majority of the qualified electors present and voting was required in order to approve a bond issue. 1879 Neb. Laws § 2, p. 170. The two-thirds majority required for school bond approval was later amended to a three-fifths majority requirement. 1917 Neb. Laws, c. 9, § 1, p. 65. No legislative history is available to ascertain the Legislature's reasoning in establishing either of these voting percentage requirements.
In 1949, the percentage requirement was again altered — from a three-fifths majority to a 55 percent requirement. 1949 Neb. Law, c. 13, § 2, p. 75. The principal introducer of the 1949 legislation indicated that the 55 percent majority provision was developed as a compromise figure which would apply to bond issue elections of all school districts. Committee Recordson LB 2, 61st Neb. Leg. (January 25, 1949) (Hearing Minutes). Institution of the 55 percent majority requirement coincided with the repeal of former Neb. Rev. Stat. § 79-2530, which had authorized, for school districts in cities with populations in excess of 1,000, bond measures upon approval of 51 percent of qualified electors.[2] The 55 percent approval requirement remained in effect for twenty-six years, until the 1971 enactment of legislation which codified the current requirement that a simple majority of voters casting ballots at a particular election approve the school district bond issue. See 1971 Neb. Laws LB 534, § 7.
 Issues Surrounding Simple Majority and Supermajority Requirements
At the time of the Legislature's 1971 enactment of the current simple majority standard, a national debate was being waged on the issue of whether, in various contexts, supermajority requirements could constitutionally be imposed by state legislatures. See Comment, Extraordinary MajorityVoting Requirements, 58 Georgetown L. J. 411 (1969); Note,Extraordinary Majority Requirements and the EqualProtection Clause, 70 Columbia L. Rev. 486 (1970); Recent Cases, 83 Harvard L. Rev. 1911 (1970). Lawsuits challenging a variety of supermajority voting requirements had been filed in California,[3] Idaho,[4] Iowa,[5]
Minnesota,[6] Missouri,[7] and West Virginia.[8]
Debate surrounding the 1971 Nebraska enactment indicates that the Legislature was aware of that litigation. CommitteeRecords on LB 534, 82nd Neb. Leg. (February 11, 1971) (Hearing Minutes); Floor Debate on LB 534, 82nd Neb. Leg., 339 (February 23, 1971) (Statement of Senator Luedtke).
At the center of the various state lawsuits — as well as at the Nebraska Legislature's consideration of the 1971 legislation — was the issue of whether supermajority voting requirements were violative of the "one-man, one-vote" principle announced by the United States Supreme Court in Gray v.Sanders, 372 U.S. 368 (1963), and Reynolds v.Sims, 377 U.S. 533 (1964). In Reynolds, the Court had examined a challenge to a reapportionment of state legislative districts in which the population represented by each district was unequal. The Court found that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. at 555. Determining that all voters should stand in the same relation regardless of where they live, the Court held that malapportionment of legislative districts unconstitutionally diluted the weight of votes cast by residents of the more populous districts. Id. at 565-66.
The Court's holdings in Gray andReynolds have commonly been denoted as the "one-man, one-vote" rule. Until the late 1960s, the "doctrine had been restricted to reapportionment cases, in which legislative districts were required to accurately reflect their relative populations in order to avoid denying qualified voters equal protection in electing their representatives." Comment,Extraordinary Majority Voting Requirements, 58 Geor. L. J. 411 (1969-70). However, litigation arising in several states[9] sought to extend application of the "one-man, one-vote" principle in order to invalidate constitutional and statutory provisions which required approval by a supermajority of eligible voters.
The debate in the 1971 Nebraska Legislature echoed the arguments being made in the various state lawsuits. Senator Roland Luedtke, principal introducer of the 1971 measure argued that any form of supermajority approval standard infringed upon the concept of majority rule. The Senator asserted: "the majority is defeated by the minority when you have a 55 percent or 60 percent requirement. . . ." Floor Debateon LB 534, 82nd Neb. Leg. 339 (February 23, 1971) (Statement of Senator Luedtke). Opponents of the measure expressed concerns regarding the level of bonded indebtedness of local government,[10] maintaining taxpayer control over local spending decisions,[11] and ensuring balanced opportunities between opponents and proponents of particular bond issues.[12] Three months after enactment of Nebraska's current statute, the issue of whether the "one-man, one-vote" rule applied to supermajority voting requirements was resolved by the United States Supreme Court inGordon v. Lance, 403 U.S. 1 (1971).
Significance Application of the Gordon Decision
Your first proposal would require that the number of registered voters casting ballots on a school bond issue be at or exceed an unspecified percentage of the total qualified electors in the school district. In Gordon, the Supreme Court found that, for purposes of constitutional analysis, there is no distinction between your proposal and the supermajority approval requirement which was under consideration in that case.403 U.S. at 7. Consequently, our analysis of your proposal will focus on the propriety of the supermajority approval requirement. At issue before the Court was a challenge to provisions of West Virginia's Constitution and statutes which provided that political subdivisions of the state could not incur bonded indebtedness or increase tax rates without the approval of 60 percent of voters in a referendum election. Id. at 2. The suit arose following a school bond election in which 51.55 percent of the total votes cast favored issuance of the bonds.Id. at 3. Having failed, however, to obtain the required 60 percent affirmative vote, the bond proposals were defeated. Id. Citizens who had voted in favor of the referendum initiated their suit seeking a declaration that the 60 percent supermajority requirement violated the Equal Protection Clause of the Fourteenth Amendment. Id.
The Supreme Court acknowledged the three-fifths voting requirement at issue "made it more difficult for some kinds of governmental actions to be taken. Certainly any departure from strict majority rule gives disproportionate power to the minority." Id. at 5-6. The Court, however, found that "there is nothing in the language of the Constitution, our history, or our cases that requires that a majority always prevail on every issue." Id. at 6. In matters of finance and taxation, the Court noted:
 It must be remembered that in voting to issue bonds voters are committing, in part, the credit of infants and of generations yet unborn, and some restriction on such commitment is not an unreasonable demand. That the bond issue may have the desirable objective of providing better education for future generations goes to the wisdom of an indebtedness limitation: it does not alter the basic fact that the balancing of interests is one for the State to resolve.
Id. at 6-7. Therefore, the Court held that so long as such supermajority provisions do not discriminate against any identifiable class they do not violate the Equal Protection Clause. Id. at 7. The Court further concluded that there exists "no independently identifiable group or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be `fenced out' from the franchise because of the way they will vote." Id. at 5.
That language has been construed "as standing for the proposition that, unless they are in some manner otherwise identified, the proponents of a bond issue are not themselves such an `identifiable class,' or a `discrete and insular minority.'" Matter of Contest of a Certain SpecialElection, 659 P.2d 1294, 1296 (Ariz.App. 1982);see also Santa Clara Co. Local Transp. v.Guardino, 909 P.2d 225, 247 (Cal. 1995) (holding that "[b]ecause persons who vote in favor of tax measures may not be deemed to represent a definite identifiable class, equal protection principles do not forbid `debasing' their vote by requiring a two-thirds approval of such measures."); Grayv. Town of Darien, 927 F.2d 69, 72 (2nd Cir. 1991) (holding that "[t]he fact that [a 60 percent supermajority requirement on bond issues] makes it more difficult for those opposed to a decision of the town's elected officials to change that decision than would be the case if only a simple majority were required is constitutionally irrelevant."); Town of Lockport v.Citizens for Commun. Action, 430 U.S. 259, 268 n. 13 (1977).
The Gordon Court expressly found "no constitutional distinction between the 60% requirement in the present case and a state requirement that a given issue be approved by a majority of all registered voters."403 U.S. at 7 (emphasis added). The Court noted:
 the latter requirement would be far more burdensome than a 60% requirement. There were 8,913 registered voters in Roane County in 1968, of whom 5,600 voted in the referendum at issue. If a majority of all eligible voters had been required, approval would have required the affirmative votes of over 79% of those voting.
403 U.S. at 7 n. 5 (citing State of West Virginia, Official Returns of 1970 Primary Election).
The Court also cited favorably to a decision on this issue which had been rendered by the South Carolina Supreme Court inClay v. Thornton, 169 S.E.2d 617 (S.C. 1969),appeal dismissed sub. nom. Turner v. Clay,397 U.S. 39 (1970). In that case, the South Carolina court upheld a state constitutional provision which prohibited the organization of any city or town "without the consent of the majority of the electors residing and entitled by law to vote within the district proposed to be incorporated."169 S.E.2d at 618 (citing S.C. Const. art. 8, § 2). The challenge to that provision arose following an attempt to incorporate a city. Pursuant to procedures which had been established by statute, an election was conducted to determine whether the city would be incorporated and, if so, to elect a mayor and aldermen. Id. There were approximately 16,900 electors residing and entitled by law to vote in the election. Id. "Of the qualified electors, 7,315 cast ballots in the election with a majority (4,572) of these voting in favor of incorporation." Id. Thus, while a majority of the votes cast favored incorporation, a majority of the 16,900 qualified electors did not vote in favor of the incorporation. The court voided the election, finding that the results could be given no legal effect since the consent of the constitutionally-prescribed majority had not been obtained.Id. at 620.
In reaching its conclusion, the court rejected an argument that the practical effect of the constitutional requirement was "to add the `non-votes to the negative votes cast' . . . thereby diluting the votes of those persons voting for incorporation."Id. The court found that such an argument was based upon the "one-man, one-vote" principles of Reynolds v.Sims, 377 U.S. 533 (1964), and concluded that those principles were not applicable to the case. Id.
As noted in Gordon, an appeal of the South Carolina Supreme Court's decision in the Clay case was dismissed by the U.S. Supreme Court. See Turner v.Clay, 397 U.S. 39 (1970). Further attempts to invalidate the South Carolina constitutional provision were also rejected by lower federal courts. See Hall v. Thornton, 445 F.2d 834
(4th Cir. 1971). We also note that one week following itsGordon v. Lance decision, the Supreme Court further upheld the constitutionality of supermajority voting requirements. The Court affirmed a federal court decision which had rejected a challenge to Missouri's two-thirds affirmative vote requirement on school bond issues. Brenner v. SchoolDist. of Kansas City, Missouri, 403 U.S. 913 (1971),aff'g 315 F. Supp. 627 (W.D. Mo. 1970).
Based upon the decision rendered in Gordon v.Lance, the Supreme Court's favorable citation to Clayv. Thornton, and the Court's affirmance ofBrenner, we find that the Legislature has the authority to impose a reasonable provision to require more than a simple majority of those votes cast at an election for approval of a school bond issue. The federal district court'sBrenner decision has been recognized as "a long and scholarly opinion"[13] to which we direct your further review for an exhaustive analysis of the significant, competing policy concerns arising from the imposition of supermajority voting requirements. Review of the constitutional and statutory provisions of other states which mandate supermajority approval requirements may also be useful in your consideration of this issue.[14]
 Issues Surrounding the Elimination of Special Elections
We now address your second proposal which would "simply eliminate the ability of school districts to call a special election for the purpose of voting on bonds. That is, if a school district wanted to pass a bond, it would have to be voted on at a general or primary election." While significant policy considerations arise in such a proposal, we find no legal impediment to the Legislature's ability to restrict voting on school district bond issues to ongoing primary or general elections.
Our conclusion is based upon several legal tenets. First, as previously discussed, the Legislature may regulate elections so long as any conditions it imposes do not conflict with the fundamental right to vote or any other provisions of the federal or state Constitutions. Cf. State ex rel. CreightonUniversity v. Smith, 217 Neb. 682, 353 N.W.2d 267 (1984);Evans v. Cornman, 398 U.S. 419 (1970); Ratiganv. Davis, 175 Neb. 417 [175 Neb. 416], 122 N.W.2d 12 (1963). Furthermore, the Nebraska Supreme Court has consistently held that "[a] school district in this state is a creature of statute and possesses no other powers than those granted by the Legislature."School Dist. of Seward Educ. Ass'n v. School Dist. ofSeward, 188 Neb. 773 [188 Neb. 772], 779, 199 N.W.2d 752, 757
(1972) (quoting State ex rel. School Dist. v. Bd. ofEqualization, 166 Neb. 785, 90 N.W.2d 421 (1958)); seealso School Dist. of Waterloo v. Hutchinson, 224 Neb. 665 [244 Neb. 665], 508 N.W.2d 832 (1993). Thus, "[t]he Legislature has plenary power and control over school districts, including provision for the appointment or election of governing bodies thereof. Consequently, it may provide limitations on any authority to be exercised by a school board." 188 Neb. at 779,199 N.W.2d at 757.
These principles have been applied by the supreme court to a controversy involving a taxpayer's challenge of a bond issue which had been approved by his school board. McCord v.Marsh, 108 Neb. 723, 189 N.W. 386 (1922). The taxpayer sought to enjoin the school board's registration of bonds in the sum of $125,000, which issuance had been authorized by the school board after being petitioned to do so by more than 51 percent of the legal voters of the district. Id. at 725,189 N.W. at 386. As one of his arguments, the taxpayer challenged the Legislature's ability to provide for school district bond issuance through the petition process. Id. The court, in upholding the bond issue, expressly determined that
 [t]he maintenance of schools is a governmental function, and it was clearly within the power of the legislature to authorize the issuance of bonds for school purposes upon any conditions it might see fit to impose. It could direct that the bonds be issued by a vote of the electors, or by petition, or by the mere action of the board itself.
Id. at 728, 189 N.W. at 388. Thus, the court concluded that "the statute authorizing the bonds was a legitimate exercise of legislative authority." Id. at 729, 189 N.W. at 388. We find it likely that the court's reasoning would also be applicable to, and sustain, a decision by the Legislature to restrict voting on school district bonds to primary and general elections.
Conclusion
We find no legal impediment to your proposal to require a certain level of participation by voters in elections to approve the issuance of school bonds[15] or to your proposal to eliminate the ability of school districts to call a special election for the purpose of voting upon a school bond issue.
Sincerely,
 DON STENBERG Attorney General
 Lauren L. Hill Assistant Attorney General
cc: Patrick J. O'Donnell Clerk of the Legislature
Approved:
Don Stenberg
[1] In 1893, the Legislature enacted Chapter 31, a provision of which pertained to school district bond funding. In a controversy arising pursuant to that enactment, the Nebraska Supreme Court speculated that the 1893 legislation "seem[ed] to have contained the first provision towards raising money for school districts for future use by the issue of bonds."State v. Barton, 91 Neb. 357, 363 (1912); seealso Taxpayers League of Wayne County v. Benthack, 136 Neb. 277,285 N.W. 577 (1939). Nowhere in its opinion did the court acknowledge the prior 1879 enactment. The 1893 legislation was actually the precursor to former Neb. Rev. Stat. § 79-2529 and § 79-2530 (1943). These statutes authorized issuance of school bonds upon approving votes of 51 percent of the ballots cast for schools in cities of populations in excess of 1,000.Cf. 1925-26 Rep. Att'y Gen. 311. The statutes existed from 1893 until their repeal in 1949. See 1949 Neb. Laws, c. 256; Revisor's Note to Chapter 79 (1950), pp. 328, 334. For purpose of this opinion, we deem the 1879 statute to be the earliest statutory provision regarding the issuance of general school district bonds.
[2] See note 1 for further explanation of the concurrent statutory requirements.
[3] Westbrook v. Mihaly, 2 Cal.3d 765,87 Cal.Rptr. 839, 471 P.2d 487 (1970) (California Supreme Court held that a two-thirds requirement for approval of county general obligation bonds violated federal equal protection principles), cert.denied, vacated, and remanded sub. nom. Mihaly v. Westbrook,403 U.S. 915 (1971).
[4] Bogart v. Kinzer, 93 Idaho 515, 465 P.2d 639
(1970) (Idaho Supreme Court reversed a lower court ruling which had determined that state constitutional and statutory provisions requiring two-thirds assent to approve the issue of general obligation bonds was violative of the "one-man, one-vote" principle), appeal dismissed for want of federalquestion, 403 U.S. 914 (1971).
[5] Adams v. Fort Madison Commun. School Dist.,182 N.W.2d 132 (1970) (Iowa Supreme Court upheld statute requiring at least a 60 percent affirmative vote in order for school district bond proposals to carry).
[6] Rimarcik v. Johansen, 310 F. Supp. 61 (1970) (federal district court held that a Minnesota statutory provision requiring a 55 percent favorable vote for adoption of amendment to a home rule charter violated the "one-man, one-vote" principle and, therefore, violated the equal protection clause of the federal Constitution), vacated and remanded forreconsideration, 403 U.S. 915 (1971).
[7] Brenner v. School Dist. of Kansas City,Missouri, 315 F. Supp. 627 (1970) (federal district court upheld provisions of Missouri's Constitution and statutes which required approval by a two-thirds majority of votes cast at school bond elections), aff'd, 403 U.S. 913 (1971).
[8] Lance v. Board of Educ., 153 W. Va. 559,170 S.E.2d 783 (1969), cert. granted sub. nom. Gordon v.Lance, 397 U.S. 1020 (1970) (West Virginia Supreme Court invalidated provisions of the state's Constitution and statutes which required that a 60 percent majority of voters in referendum elections approve bonded indebtedness proposals).
[9] See case citations in notes 3 through 8.
[10] Floor Debate on LB 534, 82nd Neb. Leg. 378 (February 26, 1971) (Statement of Senator Nore).
[11] Floor Debate on LB 534, 82nd Neb. Leg. 376 (February 26, 1971) (Statement of Senator Kokes).
[12] Id.
[13] Santa Clara Co. Local Transp. v. Guardino,902 P.2d 225, 248 (Cal. 1995).
[14] Idaho Const. art. 8, § 3 (1993) (two-thirds majority required to approve bonded indebtedness of local subdivisions); Iowa Code Ann. § 296.6 (West 1988) (60 percent school bond approval requirement); Mo. Const. art. 6, § 26(b) (four-sevenths majority required at general elections and two-thirds majority at all other elections for bond issues); S. D. Codified Laws Ann. § 6-8B-2 (1993) (60 percent bond approval requirement); Tex. Const. art. 3, § 52(b) (West 1984) (two-thirds majority bond approval requirement).
[15] As previously discussed, we find no legal impediment to enactment of a reasonable supermajority approval requirement. InGordon, the U.S. Supreme Court expressly authorized imposition of a three-fifths, or 60 percent, supermajority requirement for approval of referendum measures which increase the bonded indebtedness of political subdivisions. The Court also cited favorably to the provision of South Carolina law, at issue in Clay v. Thornton, which required approval of a majority of all qualified voters. As we have noted, however, the Court reserved ruling on "the constitutionality of [any] provision requiring unanimity or giving veto power to a very small group." 403 U.S. at 8, n. 6.